IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:13-PO-53 |
| | ) | |
| BLAKE LANE, | ) | GUYTON |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This case came before the Court on November 5, 2013, for an evidentiary hearing on the Defendant's Motion to Suppress [Doc. 1], filed on October 15, 2013. Assistant United States Attorneys Brooklyn Sawyers and David L. Gunn appeared on behalf of the Government. Attorney Bryce W. McKenzie represented the Defendant, who was also present. The parties presented evidence and argument on the motion. At the conclusion of the hearing, the Court took the matter under advisement. Based upon the evidence presented, the arguments both oral and in the filings, and the relevant case law, the Court finds no basis to suppress the evidence gained during and following the Defendant's detention on April 15, 2013.

**I. POSITIONS OF THE PARTIES**

In the early morning of April 15, 2013,[1] Defendant Blake Lane flipped his pickup

---

[1]Although both parties' briefs [Docs. 1 and 3] state that the events occurred on April 14, 2013, the Court finds that the events occurred between 1:30 and 2:45 a.m. on Monday, April 15, 2013. The Court observes that the violation notices both give April 15, 2013, as the offense date. Also, Ranger Brad Griest testified that the detention of the Defendant occurred on a Sunday night

1

truck in the left northbound lane of the Spur in the Great Smoky Mountains National Park. Following this accident, the Defendant was charged with operating a motor vehicle while under the influence of alcohol (TE41 3783548) and failure to maintain control of a motor vehicle (TE41 3783549). The Defendant argues that his Fourth Amendment rights were violated when Gatlinburg Police Department (GPD) officers detained him for over thirty minutes without conducting an investigation to determine whether he should be released. The Defendant asks the Court to suppress all evidence obtained from the illegal detention and resulting arrest.

The Government responds [Doc. 3] that officers properly detained the Defendant because they had reasonable suspicion that he was driving while intoxicated. It contends that the length of the detention–thirty to forty-five minutes–while awaiting the National Park Service (NPS) ranger's arrival was not unreasonable because the GPD officer began the investigation, the Defendant was treated by Emergency Medical Services, and the hazard created by the overturned truck constituted exigent circumstances, which required the officers to maintain the safety of the accident scene while waiting for additional officers to arrive.

## II. SUMMARY OF TESTIMONY

The Government presented the testimony of two witnesses, Officer Daniel Herron of the Gatlinburg Police Department and Ranger Brad Griest of the National Park Service.

Officer Daniel Herron testified that he is a patrol officer with the GPD and has received training and certification in investigating individuals driving under the influence of

---

through early Monday morning, when traffic was light. The Court takes judicial notice that April 15, 2013, was a Monday.

intoxicants. On the morning of the accident, he was patrolling alone, when he received a radio dispatch around 1:30 a.m. regarding an overturned vehicle on the Spur with possible injuries. He arrived at the scene, which was just past the tunnel on the northbound side of the Spur, and encountered a vehicle on its side in the left lane. There were two or three other cars pulled off the road and a group of four or five people standing nearby. Officer Herron testified that the accident appeared to be serious and had occurred in a curve in the road that was not well lit and had little shoulder. He testified that it was a "dangerous" accident scene, with the potential for a "secondary accident."

Officer Herron stated that he was the first officer on the scene and that he checked whether anyone was in the vehicle. Upon finding it empty, he asked the people on the scene who was the driver. The Defendant stepped forward and said he was the driver. Officer Herron said he was standing two or three feet from the Defendant and noticed that the Defendant was unsteady on his feet, smelled of alcohol, and slightly slurred his speech when he spoke. Officer Herron asked the Defendant if he had been drinking, and the Defendant said he had consumed two beers.

Officer Herron said that Captain Maples arrived shortly after him and began directing traffic around the accident. Officer Herron testified that based upon his training and experience, he suspected that the Defendant was intoxicated. He said that he directed the Defendant to sit on the side of the road for his safety and to "hold for the park rangers." Officer Herron asked the Defendant for his driver's license. Officer Herron then ran a records check on the Defendant's license number and found that his driver's license was valid. This took approximately two minutes.

Officer Herron testified that he then asked the dispatcher for an estimated time of arrival for a park ranger and assisted Captain Maples with directing traffic. Emergency Medical

3

Services (EMS) arrived and evaluated the Defendant. EMS determined that the Defendant did not need to be transported to the hospital. Officer Herron estimated that twenty to twenty-five minutes elapsed from the time he directed the Defendant to sit on the curb until a park ranger arrived. Officer Herron continued to assist with traffic while the ranger spoke with the Defendant and then administered field sobriety tests. The ranger did this "pretty quickly once he got there," according to Officer Herron. Officer Herron stated that in his opinion, two officers were needed to direct traffic around the wrecked vehicle.

On cross-examination, Officer Herron testified that he had been trained in DUI investigation and had experience administering field sobriety tests. He reiterated that Captain Maples arrived on the scene shortly after him and began directing traffic with a flashlight. He said that police cruisers with their emergency lights flashing were parked on either side of the wrecked vehicle. Officer Herron did not recall how many cars passed during the stop of the Defendant or whether traffic was heavy that night. He stated that five to ten minutes after he arrived on the scene, he told the Defendant to sit on the side of the road for his safety and to await the park ranger. The dispatcher reported on the check of the Defendant's driver's license within five minutes. Officer Herron opined that it would not have been safe for him to have the Defendant perform the field sobriety tests at that point. He also stated that he did not administer the field sobriety tests because another officer was not present to watch. He did not recall whether his in-car video equipment was broken, but it was not working on that evening. Officer Herron also stated that the accident had occurred outside of his jurisdiction.

Officer Herron stated that EMS arrived around twenty-five minutes after he arrived on the scene. He said Ranger Griest arrived thirty to forty-five minutes after he first arrived. He

4

agreed that Captain Maples was capable of handling traffic on a Sunday morning, and he did not recall having any issues with traffic that morning. Officer Herron recalled that a friend of the Defendant asked if he could take the Defendant home, but Herron told him "Not now" and that the Defendant needed to remain on the scene during the investigation. Officer Herron stated that the friend then left.

On redirect examination, Officer Herron testified that the Defendant told him that he had consumed two large beers. After Ranger Griest arrived, he advised the ranger that the Defendant said he had been drinking. Officer Herron said that the traffic was a concern that night because of the position of the wrecked vehicle in the road and its proximity to the tunnel.

Ranger Brad Griest testified that he has served as a ranger with the NPS since 2000 and that he is trained to investigate DUI. On the morning of the accident, Ranger Griest stated that he was not on duty. He related that he was at home in bed when he received a call from the dispatcher about a wreck on the northbound Spur. He responded to the dispatch and arrived twenty-five minutes after receiving the call. The wrecked pickup truck was located two hundred yards past the tunnel exit. Two patrol cars were on the left side of the road. Ranger Griest described the accident as "serious" and stated that its location in the lane of travel and after a curve in a section of the road with no lights and no shoulder created the potential for a secondary accident.

Ranger Griest stated that after he arrived, he spoke with Officer Herron, who identified the Defendant as the driver. Officer Herron told him that EMS had checked the Defendant, that the Defendant said he had consumed two beers, and that the Defendant's driver's license was valid according to a records check. Ranger Griest then talked with the Defendant, who stated that he had drunk two beers and had wrecked his truck. Approximately eight minutes after

5

he arrived on the scene, Ranger Griest administered field sobriety tests to the Defendant. The Defendant demonstrated clues for impairment. Ranger Griest arrested the Defendant and administered a breath test, which revealed a blood alcohol content of .15.

On cross-examination, Ranger Griest testified that the accident occurred on a Sunday night into early Monday morning and that there was not a lot of traffic during that time. When he arrived on the scene, Officer Herron's patrol car was parked in front of the wrecked vehicle and another patrol car was parked behind it. Officer Herron moved his patrol car at Ranger Griest's request in order to provide room to conduct the field sobriety tests. Ranger Griest then parked his patrol car in front of the wrecked vehicle.

Ranger Griest testified about a video recording [Exhibit 2] from his in-car camera. He stated that the clock on the video was about eight minutes slower than the dispatcher's clock, which is the more accurate of the two. Ranger Griest said that he noted his time of arrival as 2:07 a.m., which is the dispatcher's time, on his report. The video does not contain audio. The video shows that he arrived on the scene at 2:15:30 a.m. Officer Herron and Captain Maples are directing traffic while wearing reflective traffic vests. A Pigeon Force Police Department officer, Officer Ashley, was also on the scene "milling around." Ranger Griest testified that Officer Ashley was not directing traffic or questioning the Defendant.

Ranger Griest stated that he spoke with Officer Herron, who told him the Defendant was the sole occupant of the wrecked truck and had been evaluated by EMS. Officer Herron told him that he had smelled the odor of alcohol on the Defendant and that the Defendant had admitted drinking two beers. Officer Herron said that the Defendant's driver's license is valid and that he had not performed any field sobriety tests on the Defendant. The video shows Ranger Griest speaking

6

with the Defendant at 2:20:51. Officer Herron moves his patrol car at 2:21:44. At 2:22:41, Officer Herron resumes directing traffic, and Officer Ashley leaves the scene one minute later. Ranger Griest then has the Defendant perform field sobriety tests. Ranger Griest stated that he arrested the Defendant at 2:38 a.m., approximately thirty minutes after he arrived on the scene.

On redirect examination, Ranger Griest stated that when he arrived, the other officers on the scene were directing traffic. He stated that the time of arrival listed in his report is the dispatcher's time. On recross-examination, Ranger Griest testified that Officer Ashley was not directing traffic or wearing a reflective vest.

### III. FINDINGS OF FACT

The Court makes the following factual findings based upon the testimony and exhibits received at the November 5 hearing:

At approximately 1:30 a.m. on April 15, 2013, the Gatlinburg Police Department dispatcher reported an overturned vehicle on the northbound Spur, within the Great Smoky Mountains National Park. At around that same time, the dispatcher called NPS Ranger Brad Griest, who was off duty and at home asleep. GPD Officer Daniel Herron was the first officer on the scene, followed directly thereafter by Captain Maples, who began directing traffic. Officer Herron found an overturned pickup truck in the left lane of traffic, approximately two hundred yards and around a curve from the exit of a tunnel. That section of road was unlit and had little shoulder. The truck was unoccupied.

Officer Herron asked a small group of people gathered by the accident to identify the driver. The Defendant stepped forward and identified himself as the driver. Officer Herron, who

7

was standing two or three feet away, smelled the odor of alcohol on the Defendant and observed the Defendant was unsteady on his feet and his speech was slightly slurred. Officer Herron asked the Defendant if he had been drinking, and the Defendant stated that he had consumed two large beers. Suspecting that the Defendant had been driving under the influence of an intoxicant, Officer Herron directed the Defendant to sit on the side of the road and asked for his driver's license.

Officer Herron contacted the dispatcher to perform a records check on the Defendant's driver's license. The dispatcher reported that the Defendant's driver's license was valid. Officer Herron received the information on the Defendant's driver's license approximately five minutes after directing the Defendant to sit down. After inquiring about the estimated time of arrival for a park ranger, Officer Herron began assisting Captain Maples with directing traffic around the accident. Officer Herron's and Captain Maples' patrol cars were parked on either side of the overturned truck with their emergency lights flashing.

Emergency Medical Services arrived on the scene about twenty-five minutes after the GPD officers and examined the Defendant. EMS determined that the Defendant did not need to go to the hospital and left. At some point, a friend of the Defendant asked Officer Herron if he could drive the Defendant home. Officer Herron replied that the Defendant needed to remain on the scene because law enforcement was still investigating the accident. The friend then left.

Ranger Griest arrived on the scene at 2:07 a.m., approximately twenty-five minutes after Officer Herron directed the Defendant to sit on the side of the road. At that time, Officer Herron and Captain Maples were directing traffic, which was light. Officer Ashley from the Pigeon Forge Police Department was also on the scene but was not participating in the investigation or directing traffic. Ranger Griest spoke with Officer Herron and learned that the Defendant was the

driver and had a valid driver's license, that the Defendant had admitted drinking two beers, and that EMS had checked the Defendant.

Ranger Griest spoke with the Defendant, who stated that he had consumed two beers and had wrecked his truck. At Ranger Griest's request, Officer Herron moved his patrol car, and Ranger Griest parked in front of the overturned truck. Approximately eight minutes after he arrived on the scene, Ranger Griest administered field sobriety tests to the Defendant and then arrested him for DUI.

### IV. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant Lane contends that he was illegally detained beyond the time needed to investigate Officer Herron's suspicion that he was driving under the influence of an intoxicant. In this regard, he argues that Officer Herron should have administered field sobriety tests, rather than directing him to sit on the side of the road, while he directed traffic. He asserts that he was illegally detained for over thirty minutes with no investigation, while the GPD officers waited for a ranger to arrive. The Defendant argues that all evidence gained following this illegal detention must be suppresse.

The Defendant does not contest his initial detention by Officer Herron. Indeed, the Court finds that Officer Herron reasonably suspected that the Defendant had been driving under the influence based upon the one-car accident coupled with the Defendant's odor of alcohol, slurred speech, unsteady stance, and admission that he had consumed two large beers. Even without these factors, Officer Herron had probable cause to believe that the Defendant, the admitted driver of the

overturned truck, had committed a traffic violation (failure to maintain proper control of his vehicle) and could detain him for that reason as well. However, a seizure "which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." Terry v. Ohio, 392 U.S. 1, 18 (1968). Once a court determines that a seizure was proper, it must still assess "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 20. A traffic stop that is "based on probable cause and concededly lawful" can nevertheless "violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005).

In the instant case, Officer Herron arrived at the scene of the accident shortly after receiving the radio dispatch at 1:30 a.m.[2] Upon investigating the traffic accident, his suspicions were aroused when he spoke to the Defendant and observed that he smelled of alcohol, was unsteady on his feet, and slurred his speech. Officer Herron asked the Defendant if he had been drinking, to which the Defendant replied that he had consumed two large beers. Officer Herron testified that five to ten minutes after he arrived on the scene, he directed the Defendant to sit on the side of the road while he ran a records check of the Defendant's driver's license. An officer who stops a person for a traffic violation based upon probable cause can detain the person while he or she completes a records check and issues a citation. See United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999). The dispatcher relayed the information that the Defendant's license was valid within five minutes. Using the most conservative estimate of time, the Court finds that at around 1:42 a.m., Officer Herron turned from investigating the case to directing traffic. Ranger Griest arrived on the scene and began investigating the potential DUI at 2:07 a.m. The Court finds that approximately

---

[2]The violation notices list the time of the offense as 1:32 a.m.

10

twenty-five minutes elapsed between confirming the validity of the Defendant's driver's license and the arrival of Ranger Griest.

Thus, the Court must determine whether the twenty-five minute lapse of time between the receipt of information on the Defendant's driver's license and Ranger Griest resuming the DUI investigation was reasonable. "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 686 (1985); United States v. Martin, 289 F.3d 392, 396 (6th Cir. 2002) (holding that an officer's reasonable suspicion permits the officer to detain the suspect while asking a moderate number of questions to either confirm or dispel the officer's suspicions). The reasonableness of the officer's conduct is examined in light of his "suspicions and the surrounding circumstances." United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005) (internal quotation omitted). In the instant case, the Court finds that the officers on the scene acted diligently given the exigent circumstances created by the location of the overturned truck and the need for the Defendant to receive a medical examination.

The need for an officer responding to a traffic accident to attend to exigent circumstances before investigating a traffic violation is a relevant factor for the Court to consider. See Reid Machinery Inc. v. Lanzer, 421 F. App'x 497, 503 (6th Cir. 2010) (affirming scope and duration of detention lengthened by officers' request that defendant move his truck to a side road where it could be safely weighed); United States v. Porras-Palma, No. CR. 10–50044–JLV, 2010 WL 2464864 (D. S.D. June 15, 2010) (adopting report and recommendation of 2010 WL 2484090,

11

at *11 (May 24, 2010) (finding twenty-minute detention when officer left scene of traffic violation to respond to second accident before returning to conclude the investigation of the defendant was reasonable under the circumstances)); State v. Groom, No. M2002-00798-CCA-R3-CD, 2003 WL 1563667, *4 (Tenn. Crim. App. Mar. 27, 2003) (affirming detention while officer directed traffic pursuant to "public safety function"); see also Florida v. Royer, 460 U.S. 491, 504 (1983) (observing that "reasons of safety and security" could "justify moving a suspect from one location to another during an investigatory detention"). The facts in State v.Groom are remarkably similar to the instant case. In Groom, the Tennessee appellate court examined whether a twenty-seven-minute detention to await the arrival of an investigating officer following a traffic accident was unreasonably prolonged. 2003 WL 1563667, at *3-4. In that case, an officer hearing a collision while directing traffic after a concert responded to the scene, smelled the odor of alcohol on the defendant, and ordered the parties to remain where they were. The officer requested that an investigating officer come to the scene and then resumed directing traffic. Id. The court concluded that the officer acted diligently under the circumstances because the officer needed "to perform a public safety function by directing traffic," it was unsafe to perform field sobriety tests until the heavy traffic from the concert cleared, and the investigating officer did not take an unreasonable amount of time responding to the scene. Id. at *4.

Likewise, in the instant case, Officer Herron could not perform the field sobriety tests immediately because he needed to direct traffic to ensure the public safety. The Defendant disagrees that the responding officers were presented with exigent circumstances that required Officer Herron to direct traffic rather than administering the field sobriety tests. The Defendant argues that traffic was light in the early morning of a weekday and that Captain Maples could have controlled traffic

12

alone. Moreover, the Defendant contends that a Pigeon Forge officer came to the scene at some point and was just standing around. The Court credits Officer Herron's testimony that two officers were needed to direct traffic until a park ranger could arrive. Both Officer Herron and Ranger Griest testified that the location of the overturned truck created the potential for a secondary accident. The damaged and immobile truck was blocking the left lane immediately after a curve in the road. The roadway was unlit. The video recording from Ranger Griest's camera reveals that the flashing lights of Officer Herron's patrol car were not visible until Ranger Griest had rounded the curve.[3] Moreover, Officer Herron testified that at the time he arrived two or three cars were parked on the side of the road and a small group of people had gathered at the accident. The presence of bystanders increased the need for the officers to protect the public safety by directing traffic until Ranger Griest arrived.

Additionally, Officer Herron testified that he could not perform field sobriety tests without a second officer to be a witness because his in-car camera was not working. Officer Maples could not stop directing traffic in order to witness the field sobriety tests. The Court has no evidence regarding when the Pigeon Forge officer arrived or whether he could have assisted with directing traffic. The Court finds that three cars and a tractor trailer were directed around the accident scene during the short time between Ranger Griest's arrival and his initiation of the field sobriety tests. The Court also observes that because traffic was not heavy, vehicles were more likely rounding the curve quickly, rather than slowing down behind a line of other vehicles proceeding around the

---

[3] By the time Ranger Griest arrived on the scene, another patrol car with flashing emergency lights was parked on the side of the road in the curve and was visible as Ranger Griest started into the curve. The Court surmises that this may have been the Pigeon Forge officer's patrol car because Officer Herron testified that he and Captain Maples parked on either side of the wrecked truck.

accident. Accordingly, the Court finds that Officer Herron's decision to help direct traffic was reasonable. Moreover, like in Groom, there is no evidence that Ranger Griest delayed in traveling to the accident scene once he was called by dispatch. The Court finds that Officer Herron acted diligently in assuring that a ranger was on the way and then directing traffic. See Groom, 2003 WL 1563667, at *4.

Secondly, the Court finds that during the time between Officer Herron's confirming the validity of the Defendant's driver's license and Ranger Griest's arrival, EMS arrived on the scene and examined the Defendant. Based upon the extent of the damage to the Defendant's truck, a medical examination was reasonable. Officer Herron could not have performed the field sobriety tests while the Defendant was undergoing a medical examination. Accordingly, part of the twenty-five minutes leading up to Ranger Griest's arrival was devoted to a medical examination of the Defendant.

The Defendant faults Officer Herron for directing him to sit on the side of the road and not permitting him to leave with his friend. The Court has already found that Officer Herron had reasonable suspicion to detain the Defendant for DUI and probable cause to detain the Defendant for a traffic violation. Tennessee law requires an officer investigating an automobile accident occurring on any Tennessee road, "including federal interstates," to prepare an accident report. Tenn. Code Ann. § 55-10-108(b)(1). Accordingly, Officer Herron properly did not allow the Defendant to leave immediately after the license check, even if he had not been investigating a potential DUI. Although law enforcement would not be able to detain a driver indefinitely while investigating and processing an automobile accident, in the instant case, the Court has no evidence that the investigation was not proceeding at a reasonable pace given the circumstances discussed

14

above. Moreover, the Court notes that the Defendant was not handcuffed during his detention and EMS was permitted to examine him. The Court finds that the location and circumstances of the detention were not intrusive.

Because the Court finds that the Defendant was legally detained as to the scope and duration of the detention, there is no basis to suppress the evidence gained in the field sobriety tests or the subsequent breath test.

## V.  CONCLUSION

The Court has considered the parties' briefs and arguments along with the relevant case law and finds no basis to suppress the evidence stemming from the April 15, 2013 detention of the Defendant. Accordingly, the Defendant's Motion to Suppress [**Doc. 1**] is **DENIED**. The trial of this case remains scheduled for **December 11, 2013, at 1:30 p.m.**

IT IS SO ORDERED.

ENTER:

    s/ H. Bruce Guyton
United States Magistrate Judge